**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 27, 2015**

# In the Court of Appeals of Georgia

A14A2052. THOMAS v. THE STATE.

A14A2053. THOMAS v. THE STATE.

A14A2054. THOMAS v. THE STATE.

A14A2055. THOMAS v. THE STATE.

BRANCH, Judge.

Following a trial by jury during which he represented himself, Shelton R. Thomas was convicted of multiple crimes arising out of two incidents in which he accosted female victims at gunpoint. He was sentenced to life. On these pro se appeals, Thomas does not challenge the sufficiency of the evidence. Rather, he raises 13 enumerations of error regarding the trial court's rulings on motions concerning, among other things, the legality of his arrest, his right to represent himself, his right to a speedy trial and appeal, the legality of the grand jury proceedings, and his right to effective assistance of counsel during those periods when he had appointed

counsel.[1] For the reasons that follow, we affirm in part, vacate in part, and remand with direction.

On appeal, we view the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (citation omitted).

The evidence at trial shows that on the afternoon of September 1, 2007, Thomas entered the model home in the Westchase subdivision in Atlanta and approached Doreena Thomas ("Doreena"; no relation ), the on-site real estate agent, who was alone. Thomas pointed a revolver at Doreena's face, said "this is a robbery," screamed "where is the money," and threatened to shoot Doreena. Dorenna gave him the cash from her wallet. Thomas then forced Doreena upstairs and from room to room looking for more money. He eventually took her to a back bedroom and forced her to disrobe. Thomas also forced her to call her bank to check her account balances and became angry when he learned no funds were available. Eventually, however, Thomas left in Doreena's silver Pontiac Grand Am, and Doreena fled and obtained

---

[1] Thomas's fourteenth enumeration of error, concerning the sealing of two documents, has been resolved by order of this Court.

help. Doreena testified that she got a good look at Thomas, that she was very close to him at times, that he had "horrible" body odor, and that she very clearly remembered what he looked like. She identified Thomas in a police photo lineup and at trial as the man who robbed her at gunpoint.

On September 26, just over three weeks later, Thomas accosted Jamonica Deramus with a revolver just as she was leaving her home in the same subdivision where the first crime occurred. Thomas forced Deramus back into her house, made her get on the floor in the living room, and asked her for money. Deramus said that her purse was in the car but that she did not have any money, and she gave Thomas the name of her bank in response to his demand. Deramus's home alarm, which had been set with a time delay, then sounded. Thomas forced Deramus to deactivate the alarm and to tell the alarm monitoring company that there was not a problem, but the monitoring company called the police anyway. Thomas then left, and Deramus got up, locked the door, and called the police. Deramus testified that she was able to see Thomas during the incident and that he had a "really bad" body odor. She identified Thomas at trial as the man who accosted her that day.

Later that day, Officer James Jackson, Jr., of the Fulton County Police Department responded to a dispatch call regarding a suspicious vehicle — a

3

silver/gray Grand Am or Grand Prix — at a second subdivision, Ashford at Spring Lake. When Jackson arrived, he circled part of the complex and eventually saw brake lights activate on a car meeting the description given in the dispatch call and saw the car begin to back out of its parking space. As the car started to drive away, Jackson activated his emergency equipment and performed a traffic stop. Before exiting his patrol car, Jackson ran the license tag information through radio dispatch and learned that the car was owned by Doreena Thomas and that it had been reported as stolen. Jackson therefore approached the car and asked for the driver's license, which indicated that the driver was appellant Thomas. Jackson then arrested Thomas for theft by receiving a stolen vehicle, and the car was impounded. The ensuing search of the car revealed clothing, a wallet, and a loaded gun, all in the trunk. The clothing had a foul odor.

In Case No. 07SC61165, Thomas was indicted in connection with the September 26, 2007 attack on Jamonica Deramus for attempted armed robbery, aggravated assault with intent to rob, and possession of a firearm during the commission of a felony. In Case No. 08SC65866, Thomas was indicted, then later re-indicted in Case No. 08SC73242, in connection with the September 1, 2007 attack on Doreena Thomas and for armed robbery, aggravated assault with a deadly weapon,

4

kidnapping, false imprisonment, theft by taking, and three counts of possession of a firearm during the commission of a felony. On June 19, 2009, during his pretrial detention, Thomas was indicted for aggravated battery, obstruction of a law enforcement officer, and battery arising out of a struggle with a deputy at the Fulton County jail.

Most of Thomas's enumerations of error concern the lengthy procedural history of the case. The record shows that Thomas has been incarcerated since his arrest on September 26, 2007. Although Thomas's first appointed counsel — Jennifer Lubinsky of the Fulton County Public Defenders Office (FCPD) — appeared and filed discovery requests and other motions on Thomas's behalf in October 2007, , Thomas moved to remove the FCPD on November 14 in part because Lubinsky would not honor his request that she file a demand for speedy trial, which she admitted he made; for relief, Thomas asked for new counsel, or in the alternative that he be allowed to represent himself. He also filed a pro se notice of intent to demand a speedy trial based on his counsel's failure to do so, even though he was still represented by counsel. On November 30, Thomas filed a second motion to remove FCPD, seeking the same relief. On February 6, 2008, Thomas, still represented, filed a pro se demand for speedy trial.

5

In March 2008, Thomas moved pro se to recuse the first assigned judge based on a past encounter Thomas had with the judge. On March 12, without further explanation in the record, David Serwitz of the Metro Conflict Defender's Office (MCDO) entered an appearance on Thomas's behalf. On April 17, Serwitz represented Thomas at a hearing, at which Thomas told the court that he was dissatisfied with Serwitz and that he again either wanted new counsel or the option to represent himself. The court orally granted the request for new counsel and, after warning Thomas that while represented by counsel his pro se filings have no effect, granted Thomas's pro se motion to recuse the judge.

One month later, on May 21, 2008, Thomas waived his right to counsel and moved for permission to represent himself in both cases; this was his first unequivocal expression that he did not desire any counsel. On June 18, he filed a pro se motion for an expedited hearing on the matter "in order to expeditiously provide him standing to begin to file the necessary Pre-Trial Pleas, Demurrers, Notices, Demands and Motions in his defense and also to preserve his rights to an arraignment, speedy trial and bond hearing." He noted in the motion that he was acting pro se because had "no counsel of record[ ]." Indeed, attorney Bradley McMillan only made an appearance on Thomas's behalf on July 15, three months

6

after the court orally granted Thomas's motion for new counsel; there is no order appointing McMillan in the record, and there is no indication that he was a member of the FCPD. McMillan appeared on the day of the first status conference held by the "second assigned judge," who replaced the recused judge.

On September 4, 2008, the court held a hearing at which neither McMillan nor Thomas appeared.[2] Following the hearing, the court dismissed Thomas's motion to suppress identification evidence on the ground that no one appeared on his behalf; the court also granted the State's motion to allow introduction of each crime as a similar transaction in the other case. On September 19, Thomas filed his second request to waive counsel and represent himself in both cases. He simultaneously filed a pro se demand for speedy trial. He was, however, still represented by McMillan at the time.

The trial court held a hearing on October 2, 2008, at which McMillan appeared on behalf of Thomas, who was present. At the hearing, the court agreed to reconsider Thomas's motion to suppress identification evidence because McMillan stated that he was not aware of the September 4 hearing; the court did not revisit the similar transaction evidence ruling. Thomas then reiterated that he did not want an attorney because his previous attorneys had not taken sufficient action and that he was "trying

[2] On appeal, Thomas contends the court erred by holding an ex parte hearing.

7

to get this case moving." The court stated that Thomas's previous demands for speedy trial, which were filed pro se while Thomas was represented by counsel, were of no effect. But after some colloquy, the court announced that it was going to allow Thomas to represent himself with McMillan as backup counsel. The court, however, did not conduct a *Faretta* hearing before making this decision.[3] And the court never entered a written order allowing Thomas to represent himself, rendering the ruling of no effect.[4] Almost five months had passed since Thomas made his first unequivocal request to represent himself.

---

[3] See *Faretta v. California*, 422 U. S. 806, 819-820 (III) (A) (95 SCt 2525, 45 LE2d 562) (1975); *Lamar v. State*, 278 Ga. 150, 152 (1) (b) (598 SE2d 488) (2004) ("Under *Faretta* the trial court must apprise the defendant of the dangers and disadvantages inherent in representing himself so that the record will establish that he knows what he is doing and his choice is made with eyes open.") (citations and punctuation omitted). Although a pretrial hearing on a defendant's right to represent himself is ideal, such a hearing is not mandated. *United States v. Stanley*, 739 F3d 633, 645 (II) (B) (11th Cir. 2014). Nevertheless, a court should take steps to ensure that the defendant knowingly and voluntarily elected to represent himself. Id.

[4] See *Titelman v. Stedman*, 277 Ga. 460, 461 (591 SE2d 774) (2003) ("Until an order is signed by the judge and is filed it is ineffective for any purpose.") (citations and punctuation omitted); *Tolbert v. Toole*, 296 Ga. 357, 363 (3) (_ SE2d _) (2014) (trial court's indication that it would be signing an order to relieve public defender's office from representing defendant did not mean that defendant was no longer represented by counsel given that trial court never entered a written order).

In the next five weeks, Thomas, attempting to represent himself in accordance with the court's oral ruling, filed 30 defense motions and notices with the court, including motions to reconsider the ex parte decision regarding similar transactions, to record all proceedings, to provide him with access to the law library, to suppress evidence obtained as a result of his seizure, to quash his arrest, to suppress identification evidence, to sever the offenses and bifurcate the trial, to hold a bond hearing, to hold a preliminary hearing, to hire an investigator, and to hire an expert in the area of eyewitness identification; Thomas, however, did not include a demand for speedy trial among these motions. Thomas also filed a notice that he had not been arraigned in either of the two cases. On October 31, 2008, in the only apparent action of record taken by the court between October 2 and December 2008, the court held a hearing to inform Thomas, who appeared in open court without counsel, that he had been re-indicted in connection with the September 1, 2007 armed robbery incident in order for the State to add additional charges. The court did not address any of Thomas's pending motions. On November 17, 2008, the court set a trial date for December 15 and stated that "[n]o continuances would be granted."

In the next weeks, Thomas filed additional pro se motions including a notice of his alibi defense and for an expedited hearing on his motion seeking funds for

9

investigative and expert assistance. The court never addressed any of Thomas's discovery and trial preparation motions. In one motion, Thomas reiterated that he had demanded a speedy trial or a discharge and acquittal, but it appears that he was referring to a demand he made pro se while represented by counsel. McMillan never filed any motions on Thomas's behalf. In the meantime, the State turned over several large batches of discovery on November 21, 2008 and filed a notice of aggravation and recidivist punishment.

On December 15, 2008, the State filed proposed jury charges, but the record does not reveal why the trial did not occur on that day. Thomas asserts on appeal that he appeared pro se and ready for trial, but there is no transcript in the record for any such hearing. On that same day, however, the State moved for a pre-trial hearing "to make inquiry into the defendant's *competency to waive counsel* and upon a showing of competency to further direct the defendant to adhere and conform to courtroom decorum and procedure." (Emphasis supplied). As grounds therefore, the State asserted, among other things, that the "record is silent on the defendant's competency to waive counsel," i.e., no *Faretta* hearing had been held. The State further asserted that Thomas's prior courtroom conduct showed that his courtroom behavior could be

"unpredictable," that he has a history of violence, and that witnesses had expressed fear of intimidation regarding Thomas questioning them at trial.

On that same day, the court entered an "Ex Parte Order For Mental Evaluation," stating that because Thomas's mental competency had been called into question, Thomas should be evaluated at public expense; the court therefore directed the Department of Human Services (DHS) to evaluate Thomas's *competency to stand trial* and criminal responsibility at the time of the crime. The order stated that a copy of the evaluation should sent to "the defendant's attorney: Martha Yancey," apparently of the FCPD[5]; yet there is no indication in the record of Yancey making an appearance on behalf of Thomas[6] nor of what became of McMillan. Thomas continued to file pro se motions in December 2008 and January 2009, including an

---

[5] Other information in the record (namely a mental health evaluation by Dr. Jennifer Boswell issued over one year later, following a separate request that Thomas be evaluated, see infra.), states that Yancy referred Thomas for evaluation based on her single brief meeting with Thomas prior to a court appearance. According to Boswell's report, Yancey stated that "Thomas was hostile and indicated that he did not want [Yancey] to represent him and that he wanted to represent himself"; that "he seemed somewhat suspicious of the legal system in general but otherwise did not seem to be mentally ill"; and that she "made the referral as a precautionary measure due to Mr. Thomas's wish to represent himself."

[6] USCR 4.2 ("No attorney shall appear in that capacity before a superior court until the attorney has entered an appearance by filing a signed entry of appearance form or by filing a signed pleading in a pending action.").

objection to the court's order that required him to submit to a competency exam. These motions were never addressed.

On April 3, 2009, yet another attorney — Tasha Rodney of the FCPD, without making a formal appearance on Thomas's behalf, filed, purportedly on behalf of Thomas, a special plea of incompetency to stand trial in which she asserted that Thomas had been seen by Dr. Glenn Egan, Ph.D., and that Egan had concluded that Thomas was incompetent to stand trial. Yet there is no evidence in the record of an evaluation by Egan.[7] One week later, the court entered an order, drafted by Rodney, which states that Rodney had

> presented to the Court sufficient psychiatric evidence to show that [Thomas] is incapable of understanding the nature of the charges against [him], nor of understanding the object of the proceedings against [him], and is incapable of rendering the Defendant's attorney the proper assistance in [his] defense.

The court therefore ordered that Thomas be transferred to DHS to be evaluated and a diagnosis made as to whether Thomas was competent to stand trial and whether

---

[7] In fact, in her January 2010 report, Dr. Boswell stated that she had reviewed a January 2009 report by a different doctor — Dr. Jessica Tally, M.D. Neither that report nor its findings are in the record, however, and Boswell did not report that Tally had found Thomas incompetent to stand trial.

there was a substantial probability that he would attain competency in the future as provided for in OCGA § 17-7-130.[8]

In the meantime, on April 7, 2009, Thomas, pro se, filed a motion to dismiss the indictments for lack of a speedy trial.[9] The motion does not indicate that Thomas was then aware of the special plea of incompetency filed by Rodney. In the motion, Thomas alleges prejudice from the delay in several ways, all related to his attempt to prepare for trial.

---

[8] OCGA § 17-7-130 (b) provides:

(1) If an accused files a motion requesting a competency evaluation, the court may order the department to conduct an evaluation by a physician or licensed psychologist to determine the accused's mental competency to stand trial and, if such physician or licensed psychologist determines the accused to be mentally incompetent to stand trial, to make recommendations as to restoring the accused to competency. . . .

(2) If the accused files a special plea alleging that the accused is mentally incompetent to stand trial, it shall be the duty of the court to have a bench trial, unless the state or the accused demands a special jury trial, to determine the accused's competency to stand trial. Once a special plea has been filed, the court shall submit the department's evaluation to the prosecuting attorney.

[9] This is the motion the trial court addressed in an order dated April 23, 2010; that order is addressed in Division 8 of this opinion.

13

On April 28 and May 12, 2009, Thomas requested that the court send him a list of all pleadings and orders, especially those filed after October 2, 2008, the day the second assigned judge orally granted Thomas pro se status, asserting that the court had failed to copy him on all filings. Thomas also filed an objection and motion for reconsideration of the trial court's order transferring him to DHS for evaluation in which he asserted that the order was entered without his consent or knowledge and in violation of his right to represent himself and his right to a speedy trial. In the motion, Thomas admitted that he had not been evaluated in connection with the December 15, 2009 ex parte order because he did not cooperate; he argued that he was not required under the law to cooperate with a court expert. Thomas also moved pro se to disqualify or recuse the second assigned judge and the assistant district attorney, asserting that after Thomas attained pro se status, the court refused to act on his motions other than to have ex parte hearings designed to send him to Georgia Regional Hospital and to deprive him of his rights and his ability to represent and defend himself. This motion was never addressed.

Thomas filed a few additional motions that summer, but the case was mostly inactive except that on June 19, 2009, Thomas was indicted after a struggle with a

deputy at the Fulton County jail.[10] From October 8 through November 3, however, Thomas was admitted to the forensic unit of Georgia Regional Hospital pursuant to the court's April order. Also, Thomas's cases were temporarily transferred to the court's backlog judge to expedite them. Finally, on November 19, 2009, Dr. Jennifer Boswell of Georgia Regional issued a report concluding that Thomas was competent to stand trial; on December 8, the court announced in court with Thomas present that Thomas had been found competent to stand trial.[11] In her evaluation, Boswell noted that "the initial referral for evaluation was made for precautionary reasons and was not based on any observations of abnormal behavior by Mr. Thomas." But the report also states that while at the hospital, Thomas refused to meet with the evaluator or other members of the treatment team and that on one occasion, Thomas became physically combative when asked to comply with a hospital policy and that as a

---

[10] Harry Charles of the FCPC entered an appearance on behalf of Thomas in connection with the June 19, 2009 indictment.

[11] On appeal, Thomas contends he was not present for this hearing, but the backlog judge's order on Thomas's motion to dismiss on speedy trial grounds states that he appeared in court that day. There is no transcript of this hearing in the record.

result, he complained of back pain, sat on the floor, and began "exhibiting odd movements and . . . perspiring profusely." [12]

On January 21, 2010, the backlog judge held a hearing where another attorney — Marilyn Primovic, apparently of the FCPD — appeared on Thomas's behalf without formal notice to that effect.[13] At the hearing, Thomas again stated that he wanted to represent himself and to move the case forward, and the court agreed that the case needed to move. The court scheduled a case management conference for February 3 in order to conduct a *Faretta* hearing on Thomas's 20-month old request to represent himself. At that conference, after questioning Thomas in accordance with *Faretta*, the Court found that "Thomas has made a knowing, intelligent, and voluntary waiver of counsel and will be granted the right to represent himself as long as he is compliant with the rules of court and can proceed with trial in an orderly fashion." The court also appointed Primovic as stand-by counsel and ruled that the FCPD was

---

[12] Thomas contends the trial court held an ex parte hearing on January 5, 2010, but we cannot find any information about this hearing in the record, and Thomas has not provided any information about any such hearing.

[13] Thomas asserts on appeal that this is the first time that he learned that he had been stripped of his pro se status purportedly granted on October 2, 2008.

16

not disqualified from representing Thomas. The court's decision to permit Thomas to represent himself was noted in a written order.

Thereafter, Thomas again began to litigate his case by filing a flurry of motions, including asking for an expedited hearing on all of his motions. On April 5,[14] the court scheduled a hearing on all motions for April 8. There is no transcript in the record of any hearing held on April 8,[15] but the court scheduled another hearing for all motions on April 22, 2010 and apparently scheduled the trial for April 26. In the interim, Thomas filed a demand for a speedy trial or a discharge and acquittal, as well as other motions, including a request for subpoenas for his trial witnesses.

At the two-day motion hearing beginning on April 22, the backlog judge conducted an evidentiary hearing on the motion to suppress/quash the arrest and later denied the motion. The court also addressed the remainder of all motions filed by Thomas, including re-hearing the State's motion to introduce evidence of similar transactions (which the court granted ), as well as Thomas's demand for a speedy

---

[14] Thomas contends the court held an ex parte hearing on April 5, and that, consequently, the court erred. He also contends error because he was not provided a transcript of the April 5 proceedings. These issues will be addressed below.

[15] Thomas asserts error because he was not provided a transcript a transcript of the April 8 hearing.

trial/dismissal. On April 23, the court issued an order denying Thomas's motion to dismiss based on his speedy trial demand filed one year earlier. The court also found that Thomas's speedy trial motion was "frivolous and dilatory, interposed on the eve of trial . . . for the purpose of delay," and that the court "will not grant a supersedeas for any resulting direct appeal." Thomas filed a notice of appeal of that order on the same day, but he did not request a certificate of immediate review and such an order is not subject to direct appeal. *Sosniak v. State*, 292 Ga. 35, 40 (2) (734 SE2d 362) (2012).

The case was called for trial on April 26, 2010, with Thomas still acting pro se and with Bruce Vail, another FCPD attorney, appearing as back-up counsel.[16] The court explained on the record that Thomas had requested a hearing on what type of security restraint he would be required to wear during the trial and that he wanted the court "to make a determination on that issue." The court then reported that although it had requested that the sheriff's office bring Thomas to the courtroom to address the issue of security, the deputies reported that Thomas was having a seizure of some sort. A deputy appeared in the courtroom and testified under oath that when the

---

[16] The case was assigned to a different judge for trial, and he only appeared in the case on this day.

deputies attempted to put a security band on Thomas for the purpose of bringing him to the courtroom for the hearing, he "went into a seizure," whereupon he was put on the ground, and emergency personnel were called. Every time that the EMTs attempted to assist Thomas, he would again start shaking. Thomas was then transported to Grady Hospital for further observation.

The deputy testified there was no indication that Thomas was required to take seizure medication, and the court concluded that it could not determine whether what occurred was "a medical issue or a psychological issue," such as stress associated with going to trial. The court concluded, however, that Thomas was not "capable of proceeding with the trial of this case pro se, either from a medical standpoint or a psychological standpoint." Accordingly, the court continued the case until Thomas was "able to participate in the defense of his case," ordered that Thomas receive a psychological and medical evaluation, removed Thomas from acting pro se, and stated that an attorney would be appointed to represent him. The court added that it would "proceed accordingly and at that point in time."[17] Dennis Francis of the MCDO

---

[17] It appears that the court meant it would take additional action after the necessary evaluations were made.

was then appointed to represent Thomas. In the court's written order filed that same day, the court reasoned that

> it appears from the events ensuing at the call of his case for trial, that the Defendant is incapable of competently representing his interests under the stressful situation of trial. Further, given that the Defendant faces a possible maximum sentence of life in prison without the possibility of parole, the Court hereby revokes its order giving him the opportunity of self-representation before the court.

Thomas filed a pro se objection to the court's orders and moved for reconsideration.[18] There is, however, no indication in the record that Thomas was ever evaluated medically or psychologically to determine whether he was capable of proceeding pro se or that anyone, other than Thomas himself, attempted to revisit the matter.

The case proceeded for several months, still on the backlog calendar, with little activity except that the case was placed on a trial calendar for September 2010. On September 14, 2010, Thomas again argued at a motion hearing that he should be allowed to proceed pro se.[19] The backlog judge ruled that Thomas might be allowed

---

[18] On appeal, Thomas objects to the April 26, 2010 decision of the court in part on the ground that the proceeding occurred ex parte, after he had been taken to the hospital by emergency personnel. This contention is addressed in Division 11, infra.

[19] On appeal, Thomas asserts that the court held an ex parte hearing on September 7, 2010, but we can find no information about any such hearing, and Thomas has failed to provide any such information.

to try the case pro se but that because Thomas had a problem the last time the case appeared for trial, Francis would remain attorney of record for the time being and that both Francis and Thomas should be prepared to try the case. Thomas then gave what the court later described as a "rant" about how the court was not addressing his motions and concerns. The court therefore changed its ruling and decided that Thomas could not act pro se and would be represented by Francis at trial. Thomas protested, refused to stop talking, and had to be removed from the courtroom. Thomas later filed a pro se objection and a request for reconsideration, which was denied.

The case was assigned a new judge for the trial, which began on November 29, 2010. At the beginning of the proceedings but in Thomas's absence, Francis consented to, and the court granted, the State's motion to consolidate the two cases for trial. Thomas was then brought into the courtroom; he appeared in his jail clothes as a protest of the court's decision to require him to have counsel. Thomas objected to the entire proceedings as being in violation of his right to self representation under the 6th and 14th Amendments and argued that the deprivation obstructed his ability to prepare the case. After some colloquy, the court conducted another *Faretta* hearing, and Thomas was allowed to proceed pro se, whereupon he changed clothes

for trial.[20] In response to the court's inquiry, Thomas stated that he was prepared for trial and he was then tried on the charges arising out of the two September 2007 incidents. In December 2010, Thomas was found guilty on all counts in both cases, and convicted of the same except that in the case involving Jamonica Deramus, the trial court found Thomas not guilty on possession of a firearm on a technical ground. Over Thomas's objection, the trial court nolle prossed both the original indictment regarding the September 1, 2007 armed robbery and the indictment entered on the June 19, 2009 for obstruction at the jail. Thomas was sentenced to 30 years to serve on the Jamonica Deramus indictment and to life in prison in the Dorreena Thomas indictment. During sentencing, the trial court found the evidence against Thomas to be "overwhelming."

Thomas timely filed a pro se notice of appeal to all four cases but then moved for appointment of appellate counsel, which was granted on August 3, 2011. That counsel immediately withdrew the notices of appeal, prompting Thomas to move to rescind the appointment. On February 9, 2012, second assigned judge granted the

---

[20] Thomas contends the trial court held an ex parte hearing on November 29, 2010, the first day of trial. The appellate record, however, contains the record of a hearing held that day at which Thomas appeared. Finally, we can find no indication of a separate hearing that day, and Thomas has not shown that any such hearing was held.

motion and allowed Thomas to file an out-of-time motion for new trial or notice of appeal. On February 20, 2012, Thomas filed notices of appeal in all four cases, the two cases in which he was convicted, and the two cases which were nolle prossed.

1. The above evidence was sufficient to support the convictions. *Jackson*, 443 U. S. 307 at 319 (III) (B).

2. Thomas contends he was denied due process of law and equal protection when he was not provided with the transcript of every proceeding and all court records in order to adequately prepare and perfect his appeal. He itemizes 11 items that he purportedly failed to receive, including transcripts of eight pre-trial hearings, one hearing that occurred during trial, and two orders. The appellate record, however, contains three of the itemized hearing transcripts – those dated September 4, 2008, September 14, 2010, and November 29, 2010. With regard to the remainder of the items listed, Thomas has failed to make any attempt in this enumeration of error to show specifically how he has been harmed by the lack of the remaining items. "'[I]t is fundamental that harm as well as error must be shown for reversal.'" *O'Neal v. State*, 288 Ga. 219, 223 (2) (702 SE2d 288) (2010), quoting *Matthews v. State*, 268 Ga. 798, 803 (4) (493 SE2d 136) (1997). We will, however, address those purportedly

23

missing items in the context of Thomas's other enumerations of error to the extent he argues that a missing item caused harm.

3. Thomas contends the trial court erred by denying his motion to "quash his arrest" and suppress evidence on the ground that he was arrested illegally. In his motion, Thomas asserted that he was seized illegally and that there was no probable cause to arrest him on September 26, 2007. He therefore contends that all evidence taken as a result of the illegal arrest should be suppressed.

When the appellate courts review a trial court's decision on a motion to suppress evidence, "the trial court's findings on disputed facts will be upheld unless clearly erroneous, and its application of the law to undisputed facts is subject to de novo review." *Barrett v. State*, 289 Ga. 197, 200 (1) (709 SE2d 816) (2011) (citation omitted); *Jackson v. State*, 258 Ga. App. 806, 807-808 (2) (575 SE2d 713) (2002).

At the hearing on Thomas's motion, Officer Jackson testified that on September 26, 2007, he was dispatched on a suspicious vehicle call. Dispatch reported that the car had been parked in the apartment complex off and on for a week with a person in the car, that it had been parked on this occasion for over an hour with a person inside, and that either that car or another had broken out windows. There also had been recent reports of crime in the apartment complex, including "thefts on

vehicles" and "theft from vehicles." Jackson had personal knowledge of these thefts and had personally responded to one of the prior suspicious vehicle calls. Dispatch gave Jackson a description of the car, and Jackson found a car that matched the description at the location given. When the driver pulled out to leave, seemingly in response seeing the police car, Jackson pulled behind the car, activated his blue lights, and stopped the car. Jackson then ran the license tag through dispatch and learned that the car was stolen. Only then did Jackson approach and ask Thomas for his driver's license, which Thomas provided. Jackson testified that Thomas was still in the car and not in custody at that time. Jackson ran Thomas's license but found no outstanding warrants. Jackson then arrested Thomas for theft by receiving a stolen vehicle.

At the end of the testimony, the trial court held that the officer was credible and the brief stop was legal. The court therefore denied the motion. As a part of its decision, the court found that a concerned citizen had reported that a car not registered to a resident of the complex had been parked at the complex for over one hour, that the officer knew that the complex had experienced automobile theft and thefts from vehicles, that the car matched the description given by dispatch, and that the officer ran the license tag and it came back stolen.

Well-established applicable law provides that

> although an officer may conduct a brief investigative stop of a vehicle, such a stop must be justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.

*Hughes v. State*, 269 Ga. 258, 259-260 (1) (497 SE2d 790) (1998) (citation and punctuation omitted). In addressing this issue, we examine the totality of the circumstances "and determine whether the detaining officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id. (punctuation omitted). See also *Williams v. State*, 327 Ga. App. 239, 241-242 (758 SE2d 141) (2014). "This suspicion need not meet the standard of probable cause, but must be more than mere caprice or a hunch or an inclination." *Allen v. State*, 325 Ga. App. 156, 158 (751 SE2d 915) (2013) (citation and punctuation omitted).

In *State v. Carter*, 240 Ga. 518 (242 SE2d 28) (1978), an officer who had been hired to provide security at night for schools that had experienced several recent burglaries, and who had heard a police radio alert earlier concerning a certain-color van occupied by two men cruising a nearby subdivision and acting suspiciously, observed a similar-colored van drive out of the rear parking lot of one of the schools at 1:30 a.m. Id. at 518. The Supreme Court held that "[t]he totality of circumstances

26

confronting [the officer], including the time, manner of operation, and place where the officer confronted appellees, created a justifiable suspicion concerning appellees' conduct and warranted a limited investigative detention to determine if a burglary had taken place." Id. (citations omitted). Similarly, the Supreme Court upheld a traffic stop where the officer saw a vehicle at 3:45 a.m. twice drive slowly by an all-night service station that had been robbed several times recently. *Brisbane v. State*, 233 Ga. 339, 342-343 (211 SE2d 294) (1974). The court held that "under the totality of the circumstances confronting him . . . the activity of the automobile in which appellants were riding created a justifiable suspicion of their conduct so as to warrant the limited investigative detention." Id. at 343. See also *LeRoux v. State*, 300 Ga. App. 310, 312 (684 SE2d 424) (2009) (traffic stop legal where officer knew that numerous crimes had been committed on a private golf course after hours such that officers were required to patrol the property, and the officer saw defendant drive at 2:30 a.m. onto the property, past private property signs and opportunities to turn around, to end of road on the property and begin circling rather than exit the parking lot).

Here, Jackson knew that crimes, including theft from vehicles, had occurred recently in the apartment complex; that several reports had been made about the same car parking in the complex several times in the past week; that the driver of the car

27

had been seen sitting in the car without going into or out of any of the apartment buildings; that either the identified car or another in the parking lot had broken out windows; that the driver had been sitting in the described car on September 26, 2007, without any apparent business at the complex; and that the driver appeared to decide to leave when the driver saw the police car. Following the above case law, we hold that under the totality of the circumstances, Jackson had a particularized and objective basis for suspecting that Thomas might be about to engage in criminal activity in the apartment complex. Jackson then performed a brief stop during which he ran the license tag, which showed that the car had been stolen, thereby justifying the arrest for theft by receiving. Accordingly, the trial court did not err by denying Thomas's motion to quash the arrest or suppress evidence.

4. Thomas contends the trial court erred by denying his motion to set aside his convictions on the ground that his indictments were not returned in open court.[21] But Thomas made his motion long after trial,[22] and our review of the record fails to reveal

---

[21] In Georgia, a grand jury indictment must be returned in open court. *State v. Brown*, 293 Ga. 493 (1) (748 SE2d 376) (2013). "A failure to return the indictment in open court is per se injurious to the defendant." Id. at 494 (1) (citation omitted).

[22] On October 25, 2013, almost three years after his convictions, Thomas filed a motion to set aside the judgments because none of the indictments against him were returned in open court; he argued that the indictments show on their face only that they were "filed in office" by the Deputy Clerk of the Superior Court of Fulton County. The trial court denied the motion without discussion.

that Thomas objected to the indictments on this specific ground before trial. "A demurrer to the indictment, motion to quash or plea in abatement must be entered before trial." *Sheffield v. State*, 235 Ga. 507 (1) (220 SE2d 265) (1975) (citations omitted); see, e.g., *Peppers v. Balkcom*, 218 Ga. 749, 751 (2) (b) (130 SE2d 709) (1963) (contention that indictment was not returned in open court waived when not challenged before trial). Thomas therefore waived this alleged error by going to trial under the indictment without raising the objection that the indictment was not returned in open court. *Sheffield*, 235 Ga. at 507 (1).

5. Thomas contends the court erred by denying his plea in abatement regarding his re-indictment on the charges filed in connection with the crimes against Doreena Thomas. Thomas was re-indicted on October 24, 2008, and on January 8, 2009, he filed a plea in abatement in which he asserted that the indictment was returned without any legal evidence being presented and that "a vote was merely taken and a true bill returned." Thomas argued at a hearing held on April 22, 2010, that although he had received the State's case file, it only included unsigned statements of officers

29

Phillips and Jackson, which statements were purportedly provided to the grand jury. The trial court denied the motion. [23]

"Generally, with regard to the efficacy of an indictment, no inquiry into the sufficiency or legality of the evidence is indulged. Under appropriate circumstances, however, an indictment will be quashed where it is returned on wholly illegal evidence." *Williams v. State*, 244 Ga. App. 26, 27 (1) (535 SE2d 8) (2000) (citation and punctuation omitted); *Whitehead v. State*, 126 Ga. App. 570 (2) (191 SE2d 336) (1972) (defendant has burden to show that indictment was returned 'wholly' upon illegal evidence). Here, although Thomas points to two unsigned statements, he has not shown that these statements were the only evidence presented to the grand jury or that the three witnesses identified in the indictment did not provide sworn testimony at the grand jury proceedings. A plea in abatement on this topic fails when the defendant fails to show that the indictment was returned solely based on unsworn statements. See *Lennard v. State*, 104 Ga. 546 (1) (30 SE 780) (1898) (although

---

[23] Thomas asserts in his brief that his plea was denied at a hearing held on April 8, 2010, but there is no transcript of a hearing on that date in the record, and the transcript of the April 22, 2010 hearing shows that the court addressed the plea that day. Thomas has not otherwise asserted that the lack of a transcript of the April 8, 2010 hearing has caused him harm. Although he asserts that the State failed to prove at the April 8 or April 22 hearings that competent witnesses were sworn, he has not asserted that he sought such a showing at either hearing.

defendant alleged that improper oath was given to a grand jury witness, the legal oath may have been given to some other witness or witnesses, and therefore defendant's plea in abatement was properly denied). Moreover, there is no transcript of the grand jury proceedings themselves, and "[g]rand jury proceedings are confidential" such that Thomas "was not entitled to a transcript of those proceedings." *Ruffin v. State*, 283 Ga. 87, 88 (5) (656 SE2d 140) (2008) (citation omitted). Thomas has not shown reversible error.

6. Thomas contends the trial court erred when it sentenced him because it lost jurisdiction of the case on April 23, 2010, when Thomas attempted to file a direct appeal of the decision on his constitutional speedy trial motion. But defendants appealing orders denying claims of constitutional speedy trial violations are required to follow the interlocutory procedures of OCGA § 5-6-34 (b). *Stevens v. State*, 292 Ga. 218-219 (734 SE2d 743) (2012); *Sosniak*, 292 Ga. at 40 (2). See also *Murphy v. Murphy*, 295 Ga. 376, 379 (761 SE2d 53) (2014) (the ruling in *Sosniak* applies retroactively to all cases in the "pipeline"). Accordingly, because Thomas failed to properly perfect his appeal, the trial court did not lose jurisdiction. See *Wood v. State*, 199 Ga. App. 252, 254 (2) (404 SE2d 589) (1991) (where appellant failed to obtain

certificate of review, "the appellate courts did not obtain jurisdiction of his appeal and the trial court did not lose jurisdiction").

7. Thomas contends his constitutional right to represent himself was violated in two ways: (a) when public defenders Tasha Rodney and Martha Yancy on April 3, 2009, conspiring with the judge and prosecutor, filed a "bogus" special plea of incompetency to stand trial, thereby depriving him of a fair chance to present his case in his own way and significantly delaying his ability to do so; and (b) when he arbitrarily lost his pro se status twice: sometime after the second assigned judge granted Thomas pro se status on October 2, 2008, and after Thomas was taken to Grady Hospital with symptoms of a seizure on April 26, 2010. We find that the appellate record does not contain sufficient information for us to address this

enumeration of error and therefore remand for completion of the record as provided

below. See OCGA § 5-6-48 (d).[24]

Criminal defendants are guaranteed the rights to both counsel and self-representation under the federal and state constitutions. See *Faretta*, 422 U.S. at 819-820 (III) (A); *Taylor v. Ricketts*, 239 Ga. 501, 502 (238 SE2d 52) (1977) ("A state may not force a lawyer upon an appellant when he insists that he wants to conduct his own defense.") (citation omitted); Ga. Const. of 1983, Art. I, Sec. I, Par. XII & XIV. These rights include critical pretrial stages of the criminal process. *Lafler v. Cooper*, _ U. S. _ (II) (B) (132 SCt 1376, 182 LE2d 398) (2012); *Iowa v. Tovar*, 541 U. S. 77, 87-88 (II) (124 SCt 1379, 158 LE2d 209) (2004); *Ballard v. Smith*, 225 Ga. 416, 418 (2) (169 SE2d 329 (1969) ("the accused is entitled to [the assistance of counsel] at

---

[24] OCGA § 5-6-48 (d) provides, in part, as follows:
At any stage of the proceedings, either before or after argument, the court shall by order, either with or without motion, provide for all necessary amendments, require the trial court to make corrections in the record or transcript or certify what transpired below which does not appear from the record on appeal, require that additional portions of the record or transcript of proceedings be sent up, or require that a complete transcript of evidence and proceedings be prepared and sent up, or take any other action to perfect the appeal and record so that the appellate court can and will pass upon the appeal and not dismiss it.

33

every critical stage in a criminal prosecution"). If a defendant makes "an unequivocal assertion of his right to represent himself prior to . . . trial," the request "should be followed by a [*Faretta*] hearing to ensure that the defendant knowingly and intelligently waives the right to counsel and understands the disadvantages of self-representation." *Thaxton v. State*, 260 Ga. 141, 142 (2) (390 SE2d 841) (1990) (citations and footnote omitted).[25] Once given pro se status, the defendant "must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *McKaskle v. Wiggins*, 465 U. S. 168, 174 (II) (B) (104 SCt 944, 79 LE2d 122) (1984). Deprivation of the right to self-representation is structural error, i.e., errors that require automatic reversal. Id. at 177 (III), n. 8 ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless."); *Neder v. United States*, 527 U. S. 1, 8 (II) (A) (119 SCt 1827, 144 LE2d 35) (1999). There are limits to this right, however.

---

[25] Whether the defendant is capable of good lawyering is not relevant to whether the defendant is authorized to waive counsel. *Wayne v. State*, 269 Ga. 36, 38 (2) (495 SE2d 34) (1998).

Even for those who are competent to stand trial, a State may insist upon representation by counsel for those who "suffer from *severe* mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Indiana v. Edwards*, 554 U. S. 164, 178 (III) (128 SCt 2379, 171 LE2d 345) (2008) (emphasis supplied).

This record does not contain a complete history of the events related to Thomas's attempts to represent himself sufficient for us to determine whether his right has been denied. Despite the fact that Thomas requested transcripts of every hearing and asked that nothing be omitted from the appellate record,[26] the record fails to show whether the court issued a written order granting Thomas pro so status following the October 2, 2008 hearing; whether the court in fact treated Thomas as operating pro se after October 2, 2008; why and under what circumstances the trial court on December 15, 2008 ordered that Thomas be evaluated for competency to

---

[26] Thomas also asked the clerk to allow him to contact each court reporter to make arrangements for transcripts dated December 15, 2008, December 8, 2009, April 8, 2010, September 7, 2010, and September 14, 2010. Thomas later moved for copies of the same transcripts at government expense, requested an extension of time to file transcripts in connection with his appeal, and moved for an expedited hearing on obtaining the transcripts, all because he had been unable to obtain these five transcripts himself. There is no indication that the trial court ever addressed or ruled upon these motions. Of the five transcripts listed, only the September 14, 2010 transcript is in the record.

stand trial; what type of hearing was held on December 15, 2008, whether Thomas was present or represented there, and whether a transcript exists of that hearing; how Yancey and Rodney came to be representing Thomas in early 2009 and their role in precipitating competency evaluations; who evaluated Thomas for competency in early 2009, whether a competency report was prepared as a result, and what the findings were; the basis upon which Rodney filed a special plea of incompetency to stand trial on April 3, 2009[27]; and whether Thomas had knowledge of the April 3, 2009 special plea. The record also does not show why or under what circumstances Thomas's assigned public defender so frequently changed and whether, at different points in time, the pubic defender was acting as Thomas's primary or backup counsel. The record is also unclear as to whether Thomas was evaluated in accordance with the trial court's order following Thomas's medical issues the morning of April 26, 2010 or whether the State or the trial court ever followed up on any evaluation that was conducted. Some or all of this information could be relevant to a determination of whether the mental evaluations were reasonable under the circumstances, what periods of time Thomas was actually operating pro se, whether the court improperly

---

[27] We note that the United State Supreme Court has held that when a defendant is allowed to represent himself, "no absolute bar on standby counsel's unsolicited participation is appropriate or was intended." *McKaskle*, 465 U. S. at 176 (III).

delayed granting Thomas pro se status, and ultimately, whether Thomas's right to self-representation was thwarted.

"Appellate courts have authority to supplement the record pursuant to OCGA § 5-6-48 (d)," *Damani v. State*, 284 Ga. 372, 374 (2) (667 SE2d 372) (2008), and to "take any other action to perfect the appeal and record so that the appellate court can and will pass upon the appeal and not dismiss it." OCGA § 5-6-48 (d). See also *Galardi v. Steele-Inman*, 259 Ga. App. 249 (576 SE2d 555) (2002) (remanding cases to trial court for completion of record where, despite attempts to supplement the record, it did not contain all evidence presented to jury). The trial court is directed to determine whether the trial court record is incomplete as described in this Division, take steps — including holding a hearing if necessary — to complete the record, and enter an order stating that the record is complete or that it cannot be completed.

8. Thomas contends the trial court erred by denying his motion to dismiss on the ground that his constitutional rights to a speedy trial have been violated.

The Sixth Amendment of the United States Constitution and the Georgia Constitution provide that criminal defendants shall have the right to a speedy trial. *Brewington v. State*, 288 Ga. 520, (1) (705 SE2d 660) (2011). When analyzing constitutional speedy trial claims under the Sixth Amendment and the Georgia

37

Constitution as laid out in *Barker v. Wingo*, 407 U. S. 514, 530 (IV) (92 SCt 2182, 33 LE2d 101) (1972), and *Doggett v. United States*, 505 U. S. 647, 651 (II) (112 SCt 2686, 120 LE2d 520) (1992),

> the court must determine whether the interval from the accused's arrest, indictment, or other formal accusation to the trial is sufficiently long to be considered "presumptively prejudicial." If not, the speedy trial claim fails at the threshold. If, however, the delay has passed the point of presumptive prejudice, the court must proceed to the second step of the Barker–Doggett analysis, which requires the application of a delicate, context-sensitive, four-factor balancing test to determine whether the accused has been deprived of the right to a speedy trial.

*Ruffin v. State*, 284 Ga. 52, 55 (2) (663 SE2d 189) (2008) (footnote omitted). "The four factors to be considered in the case of presumptively prejudicial delay are (a) the length of the delay, (b) the reason for the delay, (c) the defendant's assertion of his right, and (d) the prejudice to the defendant." *State v. Hartsfield*, 308 Ga. App. 753, (1) (711 SE2d 1) (2011) (citation omitted). A trial court's decision on this issue is reviewed for abuse of discretion. *State v. Gleaton*, 288 Ga. 373, 375 (703 SE2d 642) (2010). Nevertheless, "where . . . the trial court has clearly erred in some of its findings of fact and/or has misapplied the law to some degree, the deference owed the trial court's ultimate ruling is diminished." *Williams v. State*, 277 Ga. 598, 601 (1) (e)

38

(592 SE2d 848) (2004). "It is imperative . . . that in cases implicating a defendant's constitutional right to speedy trial, the trial court enter findings of fact and conclusions of law consistent with *Barker*." *Higgenbottom v. State*, 288 Ga. 429, 430-431 (704 SE2d 786) (2011).

In its order denying Thomas's motion to dismiss pursuant to his constitutional speedy trial demand, the trial court considered the delay from Thomas's incarceration on September 26, 2007, through the then-scheduled trial date of April 26, 2010, a period of 31 months. The court concluded that Thomas had contributed to the delay and that he had not shown any prejudice to his case resulting from the delay. The court made other specific findings related to some of the factors, as shown below. Our review of Thomas's speedy trial claim shows that a remand to the trial court is also required on this issue.

(a) *Presumptive Prejudice*. The pretrial delay[28] in this case gives rise to a presumption of prejudice,[29] and we therefore move to the second stage of the constitutional speedy trial analysis. See *Ditman v. State*, 301 Ga. App. 187, 190 (1) (687 SE2d 155) (2009).

(b) *Barker-Wingo Factors*.

(i) *Whether the Delay was Uncommonly Long*. "The length of the pretrial delay in absolute terms plays a role in the threshold determination of presumptive prejudice. However, it also wears another hat as one of the four interrelated criteria that must be weighed in the balance at the second stage of the *Barker-Doggett* analysis." *Ditman*,

---

[28] At the time of the trial court's decision on Thomas's speedy trial motion, 31 months had passed from the time of Thomas's incarceration. The total pretrial delay, however, was 39 months. Now that the case has been tried, this total delay should be used when applying the *Barker v. Wingo* analysis. Cf. *Sosniak*, 292 Ga. at 38 ("[P]retrial denial of a speedy trial claim can never be considered a complete, formal, and final rejection by the trial court of the defendant's contention; rather, the question at stake in the motion to dismiss necessarily remains open, unfinished and inconclusive until the trial court has pronounced judgment.") (citation and punctuation omitted).

[29] As a general rule, "[t]he constitutional right to a speedy trial attaches either at the time of the defendant's arrest or at the time of his indictment, whichever occurs earlier," and "[a] delay of more than one year between the attachment of the right and the trial raises a threshold presumption of prejudice to the defendant." *Hayes v. State*, 298 Ga. App. 338, 339-340 (1) (680 SE2d 182) (2009) (citations, punctuation and footnotes omitted).

301 Ga. App. at 190 (2) (a) (citation omitted); *Fallen v. State*, 289 Ga. 247, 248 (1) (710 SE2d 559) (2011) ("The delay is then considered a second time by factoring it into the prejudice prong of the *Barker* analysis, with the presumption that pretrial delay has prejudiced the accused intensifying over time.") (citation and punctuation omitted). The extent to which delay can be seen as uncommonly long "depends to some extent on the complexity and seriousness of the charges in that case." *State v. Buckner*, 292 Ga. 390, 393 (3) (a) (738 SE2d 65) (2013). Here, the trial court failed to consider whether the delay was uncommonly long and failed to weigh this factor as a part of the balancing test, which requires remanding the case for proper consideration of this factor as a part of the full balancing test. *Johnson v. State*, 313 Ga. App. 895, 900 (2) (a) (723 SE2d 100) (2012).

(ii) *Reasons and Responsibility for the Delay*. "The second factor in the *Barker-Doggett* analysis requires the court to examine both the reason for the delay and whether this is attributable to the defendant or the state." *Ditman*, 301 Ga. App. at 190-191 (2) (b) (citation, punctuation and footnote omitted). As our Supreme Court has explained, different reasons for delay warrant different weight:

> Deliberate delay to gain an improper advantage over the accused strikes
> at the very heart of the speedy trial guarantee and is thus "weighted

heavily against the government" . . . Delays designed to hamper a defendant's ability to mount a successful defense, to harass the defendant, or to coerce him or her into testifying against a co-defendant or otherwise turning state's evidence all fall into this category. At the opposite extreme are situations where it is the defendant who requested or otherwise engineered the delay – say, for example, by going on the lam to avoid prosecution, filing a series of frivolous pretrial motions, or securing the unavailability of a critical prosecution witness. In such cases, it will be nearly impossible for the defendant to make out a violation of the Speedy Trial Clause.

*Ruffin*, 284 Ga. at 59 (2) (b) (ii) (footnotes omitted).

When examining the reasons and responsibility for the delay, the court found that Thomas had "contributed to the delay" in that he had shown an "inability to work with counsel and has, pro se, filed in excess of 90 motions requiring attention from the Court"; that the case was further delayed because Thomas required mental health evaluations before he could stand trial, "particularly as he appears pro se"; and that the State had not been negligent in preparing for trial.

The court, however, did not break down the overall pretrial delay into relevant time periods and assign responsibility for delay to each time period. See, e.g., *Jenkins v. State*, 294 Ga. 506, 511 (2) (b) (755 SE2d 138) (2014) (trial court assessed reasons for delay for three time periods). Because of the procedural complexity of this case,

the trial court could not have exercised its discretion properly under the *Barker* test without doing so. For example, the record shows that Thomas consistently sought to represent himself from as early as May 21, 2008 but did not receive a *Faretta* hearing and formal recognition of his pro se status via a written order[30] until February 4, 2010, 16 months after he was ineffectively granted pro se status on October 2, 2008. And for a portion of that time, obviously relying on the trial court's October 2 oral pronouncement that he had been granted pro se status, Thomas filed many motions in an effort to defend himself, including a motion to expedite resolution of his motions, yet none of his motions were addressed for another 16 months.[31] And it was only on December 15, 2008, a scheduled trial date, that the State acknowledged that the record was silent on Thomas's competency to waive counsel, seeking a hearing on that matter. Whether the State should carry some of the blame for this delay must be examined. Also, it is possible that Thomas was effectively unrepresented for some or all of this period of time. The record shows that between May and July 2008, Thomas was entirely unrepresented. "The State may be charged with those months

_____

[30] See *Titelman*, 277 Ga. at 461; *Tolbert*, 296 Ga. at 362 (3).

[31] Even so, during this time the court treated Thomas as pro se on at least one occasion, when Thomas appeared in court pro se on October 31, 2008 to be re-indicted in the case arising out of the September 1, 2007 incident.

43

if the gaps resulted from the trial court's failure to appoint replacement counsel with dispatch." *Vermont v. Brillon*, 556 U. S. 81, 85 (129 SCt 1283, 173 LE2d 231) (2009). In short, when addressing Thomas's motion to dismiss for lack of a speedy trial, the trial court could not have exercised its discretion properly without considering these and other time periods separately when assigning responsibility for delay or analyzing reasons for delay.

The court also held that the case was delayed because Thomas "required [a] mental health evaluation before he could stand trial, particularly as he appears pro se"; the mental health evaluations essentially brought the case to a halt from December 15, 2008, till January 2010. But the current record does not show who should be assigned responsibility for this delay and to what degree. For instance, the current record does not show what precipitated the trial court's December 15, 2008 order requiring that Thomas be evaluated for competency to stand trial and for criminal responsibility at the time of the act. Accordingly, the record does not support a conclusion that Thomas was to blame for the associated delay. The record does not reveal what occurred on December 15, 2008, in part because there is no transcript in the record for that day and in part because some events may have occurred ex parte, despite the facts that McMillan had been named back-up counsel and that Yancey was

44

also asserting that she represented Thomas. Also missing from the record is any report of a mental evaluation performed at that time. The record also does not show why, in the spring of 2009, another attorney from FCPD appeared on Thomas's behalf and filed a special plea of incompetency to stand trial. Apparently without anyone informing Thomas, the court ordered that Thomas then be sent to West Georgia Regional for another evaluation of competency to stand trial. Thus, it us unclear who should be assigned blame for the delay caused by the mental health evaluations.

We do not mean to suggest that a court is not authorized to inquire into a defendant's competency in upholding its competing duty to ensure that an incompetent defendant is not unconstitutionally tried[32] or that delay caused by counsel cannot be assigned to Thomas,[33] but only that the record before us does not contain sufficient information to support a determination that Thomas was entirely to blame from the delay associated with the mental health evaluations.

---

[32] "It is impermissible as a matter of constitutional law for a mentally incompetent person to be subjected to trial, regardless of whether that person is tried while represented by counsel or while acting pro se." *Lamar*, 278 Ga. at 151 (1) (a) (citations omitted).

[33] "Because the attorney is the defendant's agent when acting, or failing to act, in furtherance of the litigation, delay caused by the defendant's counsel [including appointed counsel] is . . . charged against the defendant." *Brillon*, 556 U. S. at 90-91 (II).

Finally, the trial court held that Thomas caused delay because he was unable to work with counsel and because he "filed in excess of 90 motions requiring attention from the Court." But the trial court's order does not explain nor does the record show how these two facts caused delay or why all related delay should be assigned to Thomas. In fact, the record reflects that from May 2008 to February 3, 2010, during which few if any of his numerous motions were addressed, Thomas steadfastly sought to represent himself yet was denied that opportunity; that with the exception of Lubinsky and Primovic, the attorneys who represented him took few steps on Thomas's behalf; that Lubinsky refused Thomas's request to file a motion for speedy trial; and that during both the period following October 2, 2008 when he thought he was acting pro se and the period following February 3, 2010 when he was fully authorized to act pro se, Thomas attempted to defend himself by filing many detailed motions about the evidence in his case yet most of his motions were not handled by the court until April 2010.[34] Finally, filing of numerous motions does not automatically mean that any associated delay should be assigned to Thomas. As previously noted, the right to self-representation includes the right to control the

---

[34] Some of Thomas's motions appear to have been addressed on April 8, 2010, but there is no transcript in the record of any hearing that day. What occurred that day could be relevant to the speedy trial issue.

defense, including making motions. *McKaskle*, 465 U. S. at 174 (II) (B). Whether individual motions caused delay must be examined. See, e.g., *Ditman*, 301 Ga. App. at 191 (2) (b) (the only pretrial motion "that could be viewed as directly causing delay was the motion for a continuance").

For all of the above reasons, we conclude the trial court abused its discretion when analyzing the reasons and responsibility for the delay in getting Thomas's case to trial.

(iii) *Defendant's Timely Assertion of the Right*. With regard to the third factor, the trial court held that Thomas filed his first demand for a speedy trial on April 7, 2009 and that this filing was "unreasonably delayed" from the time of his original indictment.

> Although the State bears the burden to ensure that an accused is brought to trial promptly, the accused bears some responsibility to invoke the speedy trial right and put the government on notice that he would prefer to be tried as soon as possible. Once the right to a speedy trial attaches, the accused must assert it with reasonable promptness, and delay in doing so normally will be weighed against him. That said, the accused is not required to demand a speedy trial at the first available opportunity, only to demand it "in due course."

47

*State v. Alexander*, 295 Ga. 154, 158 (2) (c) (758 SE2d 289) (2014) (citations and punctuation omitted). "In order to invoke the right, the accused need not file a formal motion, though that is certainly sufficient." *Ruffin*, 284 Ga. at 62-63 (2) (b) (iii) (footnote omitted).

Here, as early as February 6, 2008, Thomas filed a pro se demand for speedy trial while represented by counsel who declined to file such a demand. But a criminal defendant in Georgia "does not have the right to represent himself and also be represented by an attorney, and pro se filings by represented parties are therefore unauthorized and without effect." *Tolbert*, 296 Ga. at 363 (3) (citations omitted). Even so, the record also shows that Thomas consistently sought to represent himself and made an unequivocal demand to do so on May 21, 2008. The two issues — the timeliness of Thomas's speedy trial demand and Thomas's right to self-representation — are interrelated: if Thomas's right to represent himself was thwarted, his ability to make a speedy trial demand was affected. In addressing whether Thomas demanded his constitutional right to a speedy trial in a timely manner, the trial court failed to consider this interrelationship and possible mitigating factors regarding his demand. As the Supreme Court has held, "[a]lthough the failure to promptly assert the right to a speedy trial ordinarily weighs heavily against a defendant," the trial court in its

discretion is authorized to mitigate the late assertion of a right to a speedy trial depending on the circumstances of the case. See *Alexander*, 295 Ga. at 159 (2) (c) (citation omitted); *State v. Buckner*, 292 Ga. at 397 (3) (c). The unusual circumstances surrounding Thomas's efforts to represent himself could be seen as some evidence of mitigation, especially if the State is to blame for those circumstances. On remand, this factor of the speedy-trial analysis will have to be reconsidered. "To assess whether the accused insisted 'in due course' upon his right to a speedy trial requires a close examination of the procedural history of the case with particular attention to the timing, form, and vigor of the accused's demands to be tried immediately." *Alexander*, 295 Ga. at 158 (2) (c) (citation and punctuation omitted).

(iv) *Prejudice to the Defendant*. The trial court held that Thomas had failed to show any prejudice to his case resulting from the delay in bringing his case to trial. "The test for whether a defendant has been prejudiced requires the court to consider three interests: preventing oppressive pretrial incarceration, minimizing a defendant's anxiety and concern, and limiting the possibility that the defense will be impaired." *Ditman*, 301 Ga. App. at 194 (d) (citation, punctuation and footnote omitted). With regard to this factor,

consideration of prejudice is not limited to the specifically demonstrable, and . . . affirmative proof of particularized prejudice is not essential to every speedy trial claim. . . . [Also,] impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown."

*Doggett*, 505 U. S. at 655 (III) (A). "Although the passage of time is not alone sufficient to sustain a speedy trial claim, greater pretrial delays simultaneously increase the degree of prejudice presumed and decrease the expectation that the defendant can demonstrate tangible prejudice to his or her ability to present a defense." *Williams*, 277 Ga. at 601 (1) (d) (citations omitted).

In his motion filed on April 7, 2009, and at the hearing on April 22, 2010, Thomas argued that his defense was impaired in specific ways. He asserted that specific items were lost during the 2.5 years between his arrest and the hearing on his motion: his cell phone, which he claimed would show that he and victim Doreena Thomas had a business relationship; MARTA surveillance tapes and a record of his MARTA transactions from September 26, 2007 that would have provided some alibi information as to his location on that day at certain times; and other items. He also contends that a witness, Kevin Easter, could not be located and that Easter had

information about the September 1 victim's car. With regard to the cell phone, the state presented evidence that the only cell phones recovered in connection with Thomas's arrest and the search of the stolen car belonged to victim Doreena Thomas. And Thomas also did not explain to the trial court the relevance of Easter's testimony. The trial court therefore acted within its discretion by concluding that Thomas had shown no prejudice with regards to these items of evidence. *Cawley v. State*, 330 Ga. App. 22, 28 (2) (d) (766 SE2d 581) (2014) (trial court acts within its discretion by weighing prejudice in favor of state where there is a paucity of evidence). The trial court apparently discounted Thomas's claim that the MARTA tapes would show that Thomas was somewhere other than the scene of the crime on March 26, 2007. Nevertheless, given that the trial court must reevaluate the other factors and given that the presumption of prejudice "increases with the length of delay," this prong should be re-considered upon remand, as well. See *Singleton v. State*, 317 Ga. App. 637, 644 (2) (d) (iii) (732 SE2d 312) (2012) (citation and punctuation omitted).[35]

---

[35] Thomas also contends that two other witnesses with exculpatory testimony became unavailable during the three years between his arrest and trial. And Primovic, who represented Thomas from perhaps as early as late November 2009 through February 3, 2010, apparently as counsel and then through April 2010, as backup counsel, testified at trial that in the spring of 2010 an investigator from her office was unable to locate these alibi witnesses. But we find no indication that these points were raised in the trial court, either in Thomas's motion or at the related hearing. They therefore present nothing for this court to review. See *LaBrew v. State*, 315 Ga. App. 865, 867 (2) (729 SE2d 33) (2012).

(c) *Balancing the Four Barker Factors*. Because we have found errors in the trial court's rulings, the *Barker* factors need to be re-balanced upon remand. Id. at 645 (3) (citation and punctuation omitted). We therefore vacate the trial court's ruling on Thomas's speedy trial motion and remand the case to the trial court "for it to exercise its discretion using adequately supported factual findings and the correct legal analysis." *State v. Pickett*, 288 Ga. 674, 679 (2) (d) (706 SE2d 561) (2011).

9. Thomas contends he was denied due process of law because his multiple appeals have not been handled in a speedy manner.[36] "Significantly, there is no ruling of the trial court to review for abuse of discretion, as [Thomas] failed to raise this issue below. As a result, he may not raise this issue for the first time on appeal." *Bynum v. State*, 315 Ga. App. 392, 395-396 (3) (726 SE2d 428) (2012) (citation and footnote omitted).

10. Over Thomas's objection, the trial court nolle prossed both the original indictment regarding the September 1, 2007 armed robbery incident and the indictment entered on June 19, 2009 regarding obstruction of an officer at the jail.

---

[36] There is no Sixth Amendment right to a speedy appeal, but "due process concepts necessarily become implicated when substantial delays are experienced during the criminal appellate process." *Walker v. State*, 247 Ga. 484, 485-486 (277 SE2d 242) (1981) (citation omitted).

Thomas claims the trial court was not authorized to do so because he had filed a demand for speedy trial under OCGA § 17-7-170 in each of the two cases. See *Coker v. State*, 181 Ga. App. 559, 559-560 (353 SE2d 56) (1987) (defendant entitled to discharge and acquittal on nolle prossed counts where State failed to timely try defendant on those counts following a statutory speedy trial demand). But Thomas was represented by counsel at the time he filed these two demands pro se. Accordingly, they were of no effect. See *Howard v. State*, 307 Ga. App. 822, 827-828 (2) (c) (706 SE2d 163) (2011) (defendant's pro se motions asserting right to speedy trial were ineffective because they were filed when defendant was represented by counsel).

11. Thomas contends that the State held ex parte hearings during critical stages of the prosecution in violation of his constitutional right to be present, but we find no reversible error.

The federal and Georgia constitutions demand that a criminal defendant has a right to be present at all critical stages of the proceedings against him. *Tennessee v. Lane*, 541 U. S. 509, 523 (IV) (124 SCt 1978, 158 LE2d 820) (2004); *Smith v. State*, 284 Ga. 599, 608 (4) (669 SE2d 98) (2008). "A critical stage in a criminal prosecution is one in which a defendant's rights may be lost, defenses waived,

53

privileges claimed or waived, or one in which the outcome of the case is substantially affected in some other way." *Ballard*, 225 Ga. at 418 (2). Although "denial of the federal constitutional right to be present is subject to harmless error review on direct appeal," the same is not true for claims of violation of the right to be present under the Georgia Constitution. Id. (footnote omitted). Even so,

> This right exists where there is a reasonably substantial relation to the fullness of opportunity to defend against the charge and to the extent that a fair and just hearing would be thwarted by the defendant's absence. We have previously held that the constitutional right to be present is not violated when the defendant's absence occurs during conferences addressing legal matters to which the defendant cannot make a meaningful contribution.

*Campbell v. State*, 292 Ga. 766, 770 (4) (740 SE2d 115) (2013) (citation and punctuation omitted) (pre-trial discussion of legal motions was not a critical stage). And the right is waived

> if the defendant personally waives it in court; if counsel waives it at the defendant's express direction; if counsel waives it in open court while the defendant is present; or if counsel waives it and the defendant subsequently acquiesces in the waiver."

*Adams v. State*, 316 Ga. App. 1, 6 (2) (728 SE2d 260) (2012) (right waived where neither defendant nor counsel objected following ex parte decision to excuse juror) (punctuation and footnote omitted).

With regard to each of the claimed ex parte hearings, we find either no error or waiver. The court held a hearing on September 4, 2008; neither Thomas nor McMillan was present. But both matters addressed that day — Thomas's motion to suppress the identification evidence and the State's request to present similar transaction evidence — were re-considered at a later time with Thomas's consent. Thus, Thomas waived any claim of error regarding the September 4, 2008 hearing.

The record suggests that Thomas appeared on December 8, 2009 and heard the announcement that it had been determined he was competent to stand trial. If Thomas was present, the hearing was not held ex parte and there is no error. Even if he was not present, we find no objection to the hearing in the record and therefore no error.

The record shows that on January 5, 2010, the court may have held a status conference for attorneys to assist the court in managing the backlog docket and that notice was provided to both Primovic and Thomas. Thomas has not shown that he objected thereafter or that the conference was a critical stage of the proceeding; we therefore find no reversible error. See *Lyde v. State*, 311 Ga. App. 512, 515 (1) (716

SE2d 572) (2011) (right to be present extends only to proceedings that are critical to the outcome of the case where defendant's presence would contribute to the fairness of the procedure).

Thomas asserts that the court held a hearing on April 5, 2010, that the bailiff told him the State announced ready for trial outside of his presence, and that the court granted a continuance that day; Thomas later objected to the continuance. Thomas asked for a transcript of this hearing, and on appeal, he has raised the failure of the court to provide the transcript as error. But Thomas has not shown that any of his "rights [were] lost, defenses waived, privileges claimed or waived, or [that] the outcome of the case [was] substantially affected in some other way" at this hearing. *Huff v. State*, 274 Ga. 110, 111 (2) (549 SE2d 370) (2001) (citation and punctuation omitted). He has not claimed that any order issued or any matter was decided that affected his case other than the continuance, for which his objection was preserved. Thus he has not shown that whatever occurred on April 5 was a critical stage of the proceedings. We therefore find no error.

The record shows that on April 26, 2010, Thomas was absent because he had to be taken to the hospital and that backup counsel was present on his behalf. Although during Thomas's absence the trial court ordered that Thomas receive a

56

psychological and medical evaluation there is no indication that Thomas was ever evaluated as a result. On April 26, the trial court also revoked the February 3, 2010 ruling allowing Thomas to proceed pro se, but Thomas was allowed to revisit the matter on September 14, 2010. Although Thomas's absence on April 26, 2010 may be relevant to his right to self representation as discussed in Division 7, herein, Thomas has not shown that his absence on April 26, standing alone, substantially affected the outcome of the case such that it could be considered a critical stage of the proceedings. See *Ballard*, 225 Ga. at 418 (2).

With regard to September 7, 2010, we find no evidence of a hearing that day nor of an objection by Thomas thereafter.

Finally, we have a transcript of one hearing held November 29, 2010, and it shows that Thomas was present. At the beginning of the trial proceedings that same day, the court held a brief hearing in Thomas's absence during which Francis consented to, and the court granted, the State's motion to consolidate the trial of both cases. When Thomas began to represent himself, he learned of the court's decision but he only then objected to the ruling on the motion to consolidate, not to the fact that the decision occurred in his absence, and therefore his assertion of error is waived. *Adams*, 316 Ga. App. at 6 (2).

For the above reasons, we find no reversible error on this enumeration.

12. Thomas claims ineffective assistance of counsel, but his claims are waived. On February 9, 2012, Thomas was granted the right to represent himself on appeal and given an additional 30 days in which to file a motion for new trial and/or appeal. Because Thomas chose to pursue an appeal rather than file a motion for new trial, pursuant to which he could have raised claims of ineffective assistance of counsel, he has not preserved the issue for appellate review. *Biggs v. State*, 319 Ga. App. 631, 632 (737 SE2d 734) (2013); *Dawson v. State*, 302 Ga. App. 842, 843 (691 SE2d 886) (2010).

For all of the above reasons, we affirm the denial of Thomas's motion to suppress, vacate the trial court's ruling on Thomas's motion to dismiss for failure to provide a speedy trial, and remand the case to the trial court for the purposes of (1) perfecting the record concerning Thomas's self-representation claim, and (2) for reconsideration of his constitutional speedy trial claim. See, e.g., *Higgenbottom*, 288 Ga. at 430 (vacating trial court's order on defendant's speedy trial motion for reconsideration). Thomas shall have 30 days from the date of the last order on these two issues entered upon remand to refile his notices of appeal. Upon filing such notices of appeal, the case with the complete record and transcripts may be

58

transmitted to the Court of Appeals for redocketing. See *Galardi*, 259 Ga. App. at 249.

*Judgments affirmed in part and case remanded with direction. Barnes, P. J., and Boggs, J., concur.*